## James C. Flannigan v. State of Nebraska.

### Filed July 7, 1933. No. 28504.

*J. J. Harrington* and *J. C. Cook,* for plaintiff in error.

*Paul F. Good, Attorney General, William C. Ramsey* and *Irvin A. Stalmaster, contra:*

Heard before Goss, C. J., Good, Eberly, Day and Paine, JJ., and Tewell, District Judge.

Goss, C. J.

On September 22, 1931, an information was filed containing eleven counts, charging John M. Flannigan, described as president and agent, and James C. Flannigan, described as vice-president and agent, of the Citizens Bank of Stuart, with receiving certain described deposits while the bank was insolvent. Comp. St. 1929, sec. 8-147. Before the parties were arraigned the state dismissed as to counts one and four. Defendants pleaded not guilty, went to trial on December 7, 1931, and the trial continued each week-day until December 18, when the cause was submitted to the jury. On December 20, the jury, not being able to agree, were discharged. Later, the defendants demanded and were allowed separate trials. This trial of defendant James C. Flannigan began February 15, 1932, and continued each week-day until February 26, when it ended with a verdict of guilty on each of the nine counts. Motion for a new trial was overruled March 22, 1932, and this defendant was sentenced to the penitentiary on each count for not less than five nor more than ten years, the sentences to run concurrently. Defendant brought these proceedings in error.

The plea necessitated proofs that the bank was insolvent. This resulted in a voluminous record. There are

79 assignments of error, of which 26 are discussed in the brief of plaintiff in error, hereinafter referred to as defendant. We shall discuss, as briefly as we find ourselves able, those we think merit attention, but without following their order in the briefs. We are handicapped by the frequent failure of counsel on both sides to comply with that phase of rule 13 requiring reference to the pages of the bill of exceptions where may be found the evidence applicable to the point presented.

The most important inquiry is as to the solvency of the bank when the deposits referred to in the information were received. The first of these deposits was received November 14, 1930, and the last on November 26, 1930. The bank was closed on December 1, 1930. The bank's capital was $50,000 and its surplus $12,500, according to weekly statements made by the bank to the department beginning in July and ending in October, 1930. According to these weekly statements the resources continually stood at upwards of $500,000 and the deposits stood continually at about $60,000 less. The state's accountant testified that, as of November 14, 1930, the books showed assets $455,173.79 and liabilities $397,281.38. He testifies to the assets and liabilities on dates of other deposits charged in the information and his testimony shows that, as of December 1, 1930, the books showed total assets of $368,-295.69 and liabilities $322,551.20. He testified as to items that constituted the book assets and there was testimony by witnesses on both sides as to the values of particular items. There was evidence from which the jury might find that notes carried as assets were entirely worthless and real estate assets were worth very much less than the amount for which the bank carried them on its books. The total difference between book value and real value of the assets might well have been found by the jury at upwards of $150,000 at the time of the particular deposits. This was a question for the jury, in whose finding of guilt against defendant inhered a finding that the bank

was insolvent. There was ample evidence that the deposits so charged were received when the bank was insolvent and that defendant had knowledge of the deposits and of the insolvency. The verdict is sustained by the evidence. Barring errors, the judgment must stand.

Misconduct is charged against the county attorney occurring during his examination of a prospective juror and against the judge for what he said in the colloquy. On account of the importance attached to it by defendant, we quote from the record:

"Q. Now, would the fact that you were a witness for Jack McAllister in a contempt case growing out of a prior trial of this case, and the further fact that McAllister was found guilty—

"Mr. Harrington: Objects as improper, misconduct upon the part of the county attorney, and for the further reason that it is an improper statement, and is not a true statement of fact; there is no conviction until the case is finally determined by the supreme court, and the supreme court has held that many times.

"Mr. Cronin: He just went to jail a few minutes ago.

"Mr. Harrington: Objects as improper on the part of the county attorney, and misconduct on his part, and prejudicial to the defendant.

"The Court: Sustained; and the jurors who are to remain and try this case will absolutely disregard it.

"Mr. Cronin: We will not be permitted to go into that matter at all, your honor?

"Mr. Harrington: Objects as an improper statement and misconduct on the part of the county attorney.

"The Court: Sustained; I will not permit you to go into that matter any further than we have gone."

It is unlikely that the fact of the McAllister conviction for contempt would, in the circumstances, be unknown to the members of the jury panel. Whatever the effect of the county attorney's words, it was promptly offset by the instruction of the court to disregard them. Miscon-

duct · is attributed to the judge because of the last five words quoted above. This in no sense approved the action of the county attorney as far as he had gone, as defendant argues. The court had just emphatically disapproved it, and should not be held down to those niceties of oral expression implied in the criticism of these isolated words.

Coupled with the foregoing, it is complained by defendant that the court took unusual precaution to segregate the jury from outside influence, even to the extent of having their letters censored and examined by the court each morning. These were matters for the court. The record does not show an abuse of discretion in either the doing or the manner in which this was done by the court.

Error is assigned and argued as to the conduct of Mr. Stalmaster, special counsel and prosecutor for the state, in his opening statement to the jury and the words of the court in ruling on objections thereto. One item of the assets of the bank related to what is called the Sixberry land. Mr. Stalmaster told the jury this item was carried on the books of the bank at $2,400, and that the prosecutor would show the actual value of the land by folks who live in the neighborhood, who are impartial and "who have no interest in this lawsuit." Objection was made to the prosecution arguing the case, whereupon the record shows the following:

"Mr. Harrington: Objects to counsel arguing the case.

"The Court: That is not arguing the case.

"Mr. Harrington: Talking about the kind of men they are and all that?

"The Court: They are citizens of the neighborhood and have no interest. Go on."

It is strongly urged in the briefs, and was vehemently argued at the bar, that this last quoted statement of the court indorsed the witnesses for the state as to the "value of the assets of the bank including the land," and "doomed the defendant." While the comment of the court might better have been omitted, we must take it in its setting.

It is clear that the court did not apply it to witnesses other than as to the item of the Sixberry land and was attempting to make clear to counsel what the prosecutor had implied—that these neighborhood witnesses to be produced would have no financial interest in the lawsuit and that it was "not arguing this case" for the prosecutor to tell the jury in his opening statement what kind of witnesses he intended to produce. Later the court gave the jury a conventional instruction on the credibility of the witnesses and told them that this was a question exclusively for the jury to determine. Moreover, this item complained of refers only to testimony as to the Sixberry land, which the bank carried as assets at a valuation of $2,400, which the state's witnesses valued at $1,400, and defendant's witnesses valued at $3,200. No prejudicial error appears in this assignment.

Error is assigned because, in his argument to the jury, the special prosecutor stated to the jury that the evidence showed that John M. Flannigan had stolen $21,000 of the bank's money in what was known as the Jamison deal and that defendant knew all about it, but that the court refused, on objection and request, to caution the prosecutor and to admonish the jury to disregard it; that the court in this connection refused to call the reporter from an adjoining room to make the record, to avoid the necessity of making it by affidavit on this and other occasions during the argument. We find enough evidence to justify an argument that John M. Flannigan profited personally in the matter and that defendant had knowledge of it. The reason for the judge not calling the reporter is that the reporter was writing the instructions of the court in the early part of the argument. At any rate, the objection and ruling of the court were preserved by affidavit. Later the reporter was secured and made the record for defendant as to other parts of the argument. So far as these objections go they do not appear to have resulted in prejudicial error.

In the opening statement the prosecutor outlined briefly what he expected to prove in relation to the connection of John M. Flannigan with an undivided interest in what was called the Brewer land carried by the bank at about $11,000, which the prosecutor states he would show "was not worth what they put it in for; it was only to settle John M. Flannigan's lawsuit." Frankly, the statement about the lawsuit is incoherent to the writer and we do not understand what significance it had. Perhaps the jury did. If so, and if it was erroneous, it was cured by what followed. In his closing argument, it appears from the affidavit of the county attorney, relating to the Brewer land, the special prosecutor pointed out to the jury "that evidence to support his (opening) statement was wholly lacking and should be by the jury entirely disregarded." In his instructions to the jury the court told them to take into consideration all the evidence bearing upon the guilt or innocence of the defendant; and that "the evidence is not what counsel on either side said to you in their opening statements that they expected the testimony to show." In the argument to the jury the special prosecutor discussed the testimony of Joe Juracek, a witness for the state, as to an attempt by defendant to procure the witness to bribe a juror just prior to the first trial. There is evidence to show that defendant personally and through Harry Kopp did attempt to use Juracek to bribe a juror. This is the same type of charge growing out of the same attempt for which Kopp was convicted of contempt of court. His sentence was affirmed in this court February 14, 1933. *Kopp v. State*, 124 Neb. 363. On the present trial Juracek testified that defendant solicited him to buy one Rosenkrans, one of the parties summoned for jury service on the first trial, to hang the jury, promising the witness $25 and offering to pay Rosenkrans $25 and maybe he would double it. The court correctly overruled the objection to this testimony. It was admissible because defendant was directly connected with the attempt to

corrupt the juror. 16 C. J. 556, sec. 1076. The special prosecutor was authorized to argue the testimony to the jury.

On direct examination John M. Flannigan testified on behalf of his brother, among other things, that his own salary from the bank was $150 a month and that he never had drawn more; that his brother received the same salary. On cross-examination he was confronted with the income tax returns of the bank for 1929, signed and sworn to by him, showing his salary in 1928 to have been $3,550. While the witness testified that there must be some mistake in the schedule and that he drew only $1,800 a year, yet the testimony, objected to on his behalf, was allowed to stand, and is now claimed to have been erroneously admitted. It was entirely proper to cross-examine him on this subject on which he was examined by his own counsel and to confront him with what he had said on the same subject in the income tax report made or approved by him. The purpose was to impeach his credibility. That this evidence did not come from the records of the bank or that it came from the income tax report furnished to the state by the internal revenue department did not make the admission of the testimony erroneous.

During the trial defendant sought to prove the situation of the banks with which he formerly discounted his notes, but on objection by the state that this was immaterial defendant was not permitted to answer. In the colloquy between counsel for defense and the court, the latter stated that he had been quite liberal and the defense had introduced in evidence quite a number of things that the court questioned "whether they are material or not." Counsel thereupon requested the court to point out anything that was immaterial, and the court answered "anything that I have admitted the jury can consider; that is all now; go on." This incident is characterized in the brief of defendant as "the most flagrant

example" of the prejudicial conduct and remarks of the court with which counsel for defendant say they were "harassed and embarrassed" during the examination of defendant. The particular ruling excluding the evidence was not erroneous. The court did not say that he had admitted any immaterial testimony, merely that he questioned whether he had not been too liberal, but ended by saying that the jury might consider anything which had been admitted. The point mainly stressed is that the court here and elsewhere was urging defendant's counsel to hasten along, with the intimation to a tired jury that too much time was being consumed in the trial and that this discredited defendant's case. None knew better than the jury that the state consumed approximately twice the time the defense took. So this argument would imply that the desire of the court for speedy action discredited the state to a greater extent than defendant.

All through the consideration of this case we have to keep in mind that counsel and court are human. They were men before they became officials of the court; and the aggressiveness of counsel on both sides as well as the forcefulness of the trial court resulted in clashes of will and in expression which have to be considered in the light of these known and manifested characteristics. The jury would sense these things and make due appraisal of them perhaps even more readily than a reviewing court.

There are other assignments of lesser importance, charging errors during the taking of evidence, which we have examined, but which we do not think merit extension of this opinion.

Defendant assigns as error the refusal to give his requested instruction as to knowledge of insolvency of the bank, the gist of which is that defense must have "had actual notice of its insolvency," meaning "an actual guilty knowledge, and not lack of knowledge from negligence, carelessness or lack of business judgment or overconfidence on the part of the defendant." The court adequate-

ly instructed on the subject when, in defining the elements, he required proof beyond a reasonable doubt that defendant "knew when said deposits were received and accepted into said bank that said bank was insolvent;" and said in the next instruction:

"To know a thing or have knowledge of it is an impression of the mind, the state of being aware, and this may be acquired in numerous ways and from many sources. It is usually obtained from a variety of facts and circumstances. Generally speaking, when it is said a person has knowledge of a given condition, it is meant that his relation to it, his association with it, his control over it, and his direction to it are such as to give him actual information concerning it."

Moreover, the refused instruction would put a premium upon and emphasize the lack of business judgment or the overconfidence of agents of banks, as if they might be permitted to receive all deposits irrespective of the obligation to be informed as to the likelihood of ever being able to repay them. Such an instruction would have a tendency to mislead the jury and was properly refused.

Other errors are assigned as to instructions given and instructions requested and refused. These have been examined. To discuss them separately would unduly extend an already long opinion. Suffice it to say that in each instance the court either correctly instructed the jury on the necessary point or the requested instruction contained some features that justified its refusal. Surveying the whole case, we are of the opinion that the judgment of the district court was right. It is

AFFIRMED.